STATE OF NEBRASKA, APPELLEE, V. MERLE KUNTZELMAN, APPELLANT.

337 N.W.2d 414

Filed August 5, 1983. No. 82-513.

L. William Kelly III, of Kelly & Kelly, for appellant.

Paul L. Douglas, Attorney General, and Mel Kammerlohr, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

WHITE, J.

This is an appeal from the District Court for Boone County, Nebraska, in which the defendant was charged with and convicted of two felony counts, murder in the second degree and use of a firearm in the commission of a felony. He was sentenced to a term of 20 years on the second degree murder count and a consecutive term of 5 years on the offense of use of a firearm in the commission of a felony. Defendant appeals and assigns three errors: (1) The court erred in submitting to the jury the offenses of murder in the second degree and the use of a firearm in the commission of a felony, contending that since they arose out of the same act the defendant has been placed in double jeopardy; (2) The trial court erred in admitting seven photographs showing the deceased's body before and during the autopsy proceedings; and (3) The trial court erred in failing to submit the defendant's claim of self-defense to the jury. We affirm.

The evidence shows that the incident which gave rise to the conviction and this appeal occurred at or around St. Edward, Nebraska. The victim and four companions spent the afternoon of August 30, 1981, engaged in drinking large quantities of beer at the home of the victim and in a pickup truck while generally traveling the county roads of Boone and Nance Counties, Nebraska. On that same Sunday the defendant, Merle Kuntzelman, left home around 2:30 p.m. and went to the home of a Gary McBride for an afternoon of watching television. The evidence does not disclose that any of the McBrides or the defendant drank any alcoholic liquor or ingested any narcotics. After concluding their viewing of the television football game, two other McBride brothers, David and Sam, arrived and Sam announced that his automobile had stalled near an intersection

in St. Edward, Nebraska. The defendant took the McBrides in his van to the business place of Sam's employer where a wrecker truck was secured. The two vehicles were then driven to the scene, and the car was retrieved and brought to the McBride residence. Present at this time were the defendant, age 23, and the McBride brothers, Sam, Gary, and David, all close in age to the defendant.

Shortly after the McBrides backed the wrecker truck and the towed car into the driveway at the McBride residence, the pickup truck in which the victim and his four companions were riding arrived back in St. Edward and drove by the area of the McBride home. At this time David McBride had gone into the house. Gary and Sam McBride were in the wrecker and the defendant had been watching them back the car into the driveway. As the pickup truck drove around the second time, obscenities were shouted from the pickup truck at the McBrides and appeared to be most specifically directed toward the defendant.

There was a history of animosity and hostility between the defendant and the victim, Daniel Wilson, and his companions. Ross Davidson, driver of the pickup, had on a previous occasion accused the defendant, who at the time was driving a car, of forcing a motorcycle on which Davidson was riding off the highway and into a ditch. Subsequent thereto, Davidson chased an automobile driven by Kuntzelman for an extended period and shot out a window, with what is described in the evidence as a BB gun, for which offense Davidson was arrested and fined.

Davidson, the victim, and the three other companions left the parked pickup truck and were advancing onto the McBride premises. As the group approached, the defendant and two brothers, Gary and David McBride, got into defendant's van and the third brother, Sam, was standing beside the wrecker, which was backed into the driveway. The group advanced on the van. The defendant locked

the doors and drove away but not before the van had been pummeled somewhat and the windshield wiper on the passenger side bent. They intended to go to the automobile salvage yard and give Sam McBride, who was driving the wrecker, a ride back after he had returned the wrecker. The salvage yard was approximately nine blocks away from the McBride residence. After waiting 4 to 5 minutes for the wrecker to arrive, the defendant concluded that Sam might be in some danger from the victim and his four companions. He thereupon left the automobile salvage yard and made a slight detour to his home, where he secured a 12-gauge shotgun and three shotgun shells, which he loaded into the magazine. When he arrived back at the McBride residence, he got out of his van with the shotgun, which he had taken from a case. At that time Elbert Anderson, one of the participants, opened the door of the wrecker and was attempting to push or strike Sam McBride through the open door, and another of the victim's companions was pounding on Mrs. McBride's car. At a time when the victim was approximately 25 feet away, the defendant put one round in the chamber and shouted "get out of here." The gun was then discharged over the heads of the victim and the others into a tree. At a time ranging from 10 to 30 seconds he again repeated "get out of here" and discharged the gun for the second time. The victim then made a statement to the defendant, which the defendant and others characterized as a smart-aleck statement such as "You haven't the courage to shoot me," or words to that effect, whereupon the victim advanced from his position of 25 feet from the defendant to a point about 12 to 14 feet from him. The shotgun was discharged a third time, striking Daniel Wilson below the left shoulder, killing him instantly. At the time of the discharge the victim was not armed, nor were any of his companions. They carried no weapon of any kind, and,

according to witnesses, the victim did not have his fist clenched.

In support of his first assignment of error, while conceding that the rule in Nebraska is otherwise, defendant urges this court to adopt the rule of the Missouri court in *State v. Haggard*, 619 S.W.2d 44 (Mo. 1981), which stated at 51: "Until such time as the Supreme Court of the United States declares clearly and unequivocally that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution does not apply to the legislative branch of the government, we cannot do other than what we perceive to be our duty to refuse to enforce multiple punishments for the same offense arising out of a single transaction." The rule in Nebraska is as follows: "This court has held that a distinction exists between an offense and the unlawful act out of which it arises, it being possible that two or more distinct offenses may grow out of the same transaction or act; and the rule that a person cannot be twice put in jeopardy for the same offense has no application where two separate and distinct crimes are committed by one and the same act, because the constitutional inhibition is directed to the identity of the offense and not to the act." *State v. Robinson*, 202 Neb. 210, 214, 274 N.W.2d 553, 555-56 (1979). The U.S. Supreme Court in *Whalen v. United States*, 445 U.S. 684, 100 S. Ct. 1432, 63 L. Ed. 2d 715 (1980), held that multiple punishments could be imposed for the same offense without running afoul of the double jeopardy guarantee of the fifth amendment to the Constitution where it was specifically authorized by state statute. The defendant has cited no sound reason why our long-established rule should be changed. We decline to do so.

Passing to the second assignment of error, we are again faced with an overabundance of prosecutorial zeal in direct defiance of our prior cases disfavoring the admission of gruesome photographs. The prosecution offered, and the trial court admitted, seven

photographs of the victim. The first and second photographs showed the victim fully clothed, one at the scene and one in the autopsy room prior to removal of clothing and exposure of the wounds. The third and fourth photographs showed the defendant's unclothed body with severe shotgun wounds in the upper left chest area. The fifth, sixth, and seventh photographs show the details of the puncture marks at or about the lung area, the empty body cavity showing pellet marks in the spine, and a removed lung showing damage to the lung by pellets. The cause of death was never a substantial issue in this case. Ample eyewitnesses were presented that testified the deceased met his death as a result of the discharge of a firearm. Defendant, however, acknowledges that each of the photographs was used to present the testimony of the pathologist who performed the autopsy to support his conclusion that the deceased met his death as the result of the pellets discharged from the defendant's shotgun. Once again, we are unable to state conclusively that the trial court abused its discretion in admitting the photographs. We held in *State v. Robinson*, 185 Neb. 64, 68, 173 N.W.2d 443, 446 (1970): "Such evidence is generally admitted for purposes of identification to show the condition of a body and to indicate the nature and extent of wounds or injuries. . . . It is also admitted to establish malice and intent." We further held in *State v. Williams*, 205 Neb. 56, 67, 287 N.W.2d 18, 25 (1979): "In a homicide case, photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of wounds or injuries, and to establish malice or intent." We find that the District Court did not abuse its discretion in admitting the photographs.

The third and final assignment of error relates to the court's refusal to give the self-defense instruction based on Neb. Rev. Stat. § 28-1409 (Reissue

1979). It reads in part: "(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat, nor is it justifiable if: (a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or (b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . ." The defendant testified that the shooting was accidental and that he intended to shoot above the victim rather than at him. The defendant voluntarily left the scene and returned after securing a shotgun, provoking the exchange himself and coming within subsection 4(a) of § 28-1409. In addition, the defendant voluntarily returned to the scene knowing that he could again safely retreat in the van if he chose to do so, thereby invoking the prohibition of subsection 4(b) of the same section. Further, the defendant did not introduce evidence that, by reason of the circumstances, it was necessary to protect himself against death, serious bodily injury, kidnapping, or sexual intercourse compelled by force or threat.

The testimony of the defendant's psychiatrist, taken on its face, indicates only that the defendant intended to use the weapon to scare the victim and his companions into leaving the McBride premises. On the second shot, by reason of a low mental ability he panicked and was in shock when he discharged the third shot in the direction of the victim. The shock was not from a fear of impending harm, even though he was admittedly scared. It was simply a shock that his ruse to secure the departure of the victim and his companions had failed. Although the conduct of the victim and his companions was not exemplary and to some extent they provoked the occurrence of the incident, the use of deadly force against a threatened minor brawl or fight, without

weapons, between persons of equal or superior size cannot be justified.

The judgment and sentence of the trial court are affirmed.

AFFIRMED.